# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Daniel D. Domenico

Civil Action No. 1:17-cv-01983-DDD-NRN

MARITZA ANZORA,

      Plaintiff,

v.

JOSE LEZAMA, and
MEJA LOGISTICS, LLC,

      Defendants.

---

## ORDER

---

This diversity case for damages arises out of a midnight collision between two tractor-trailers. Plaintiff alleges that she sustained injury when Defendant, travelling in the opposite direction, negligently veered into her lane and struck the driver side mirror of her truck. Before the Court are several evidentiary motions, which the Court considers in turn.

## I.    BACKGROUND

The basic facts are not in dispute. Plaintiff Maritza Anzora and Defendant Jose Lezama are tractor-trailer (i.e., semi-truck) drivers. Defendant Meja Logistics, LLC, is Mr. Lezama's trucking company. On May 9, 2016, at 12:45 a.m., Ms. Anzora and Mr. Lezama were traveling in opposite directions on U.S. Route 40 in Lincoln County, Colorado. Ms. Anzora had just taken over driving from her husband and was heading east. Near milepost 420 on the two-lane highway, Ms. Anzora alleges

1

she saw Mr. Lezama's westbound semi-trailer headed toward her and entering her lane. She swerved to the right shoulder, but despite her best efforts she could not avoid a collision between the driver-side mirrors of the two trucks. Debris from Mr. Lezama's truck broke through Ms. Anzora's windshield and struck her head, face, neck, chest, and arms. She pulled over to the side of the road, but Mr. Lezama kept driving and was miles away before the authorities caught up with him. The Colorado State Patrol responded to the scene of the collision, investigated further, concluded that Mr. Lezama had fallen asleep at the wheel, and cited him for careless driving in violation of Colo Rev. Stat. § 42-4-1402.

Ms. Anzora filed this diversity action on August 16, 2017, asserting a single claim of negligence against Defendants, who denied liability and maintain that Mr. Lezama did not enter Ms. Anzora's lane. Discovery is complete, the deadline for filing dispositive motions has passed, and the parties now move to exclude certain evidence at trial. Defendants seek to limit testimony of the investigating officer, who cited Mr. Lezama for the accident, and additional witnesses who aim to testify concerning the reasonableness of Ms. Anzora's medical bills. (Docs. 87, 95, 96, 97.) Ms. Anzora moves to exclude Mr. Lezama's accident reconstruction expert entirely, asserting his conclusions are impermissibly unreliable. (Doc. 110.) These matters are ripe for review. (Docs. 91, 94, 98, 99, 100, 104, 105, 106, 119, 122.)

## II.    ANALYSIS

The motions before the Court concern, in large part, the standard for admission of opinion testimony by experts. Pursuant to Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Additionally, Rule 703 permits an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed."

While the proponent of expert testimony is not required to prove that the expert's opinion is objectively correct, it bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999); *Benton v. Avedon Eng'g, Inc.*, No. 10-CV-01899-RBJ-KLM, 2012 WL 3399367, at *2 (D. Colo. Aug. 15, 2012) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n.10 (1993)). In evaluating proffered expert testimony under these rules, a district court must first decide "whether the reasoning or methodology underlying the testimony

is [ ] valid." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993)). Second, the district court must inquire into whether proposed testimony is sufficiently "relevant to the task at hand." *Id.* Third, it must decide whether the testimony is reliable. To this end, a court's function is that of gatekeeper, which it performs by making specific findings on the record. *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).

"[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell*, 165 F.3d at 782. Additionally, "[u]nder the regime of *Daubert* . . . a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.* at 783. Whether the specific expert testimony at hand focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own. The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (holding the *Daubert* factors

applicable to all types of experts). With these principles in mind, the Court turns to the motions at hand.

## A. Defendants' Motion to Limit Testimony of Trooper Kirby

Colorado State Patrol Trooper Delbert Kirby has thirteen years of experience in his position. He has over 256 hours of accident reconstruction training through a variety of classroom and practical exercises. His topics of study included—among others—classification and processing of an accident scene, the different types of roadway evidence, vehicle damage analysis, hit and run accidents, crash scene photography, related mathematical principles, and deciphering "how" a crash occurred. He regularly completes online refresher courses.

Trooper Kirby was on duty during the early hours of May 9, 2016. Dispatch notified him of the collision, and he arrived about an hour after it occurred. Only Ms. Anzora's truck remained at the scene, but it had been moved from the point of impact. He noted the damage to the truck, clear weather conditions, and lack of obstructions on the road. He went to the hospital and interviewed Ms. Anzora who spoke consistently with her allegations in the Amended Complaint. After Mr. Lezama's truck was stopped some miles away, Trooper Kirby interviewed him. Mr. Lezama stated that Ms. Anzora's truck had gotten too close to the center and the mirrors clipped as he was trying to set his radio station.

Trooper Kirby then prepared an accident report form, including a field sketch diagram, in which he concluded that Mr. Lezama crossed the double yellow line into Ms. Anzora's lane, was distracted, likely fell asleep, and hit Ms. Anzora in her lane.

While his conclusion considered all the evidence he gathered, he testified at deposition that it was largely based on his evaluations of the parties' statements and their post-collision conduct:

> **Q. When you're investigating a crash like this, how do you decide the outcome? How do you decide responsibility?**
>
> A. This crash was a little bit unique in that there was no definitive point of impact where the accident happened that I could say 100 percent positive that it either happened in her lane or in his lane. I based this decision on their statements, based on the fact that she stopped and reported it, based on his statement that he didn't have a cellphone signal to report the crash. And after that he actually drove through the nearest town where there would be a dispatch center, a hospital, and a gas station where he could've stopped and reported the accident.
> . . .
>
> **Q. When you make an assessment to your opinion on what happened, how big of a role does your interpretation of the truthfulness of a witness play?**
>
> A. It depends on the circumstances. In this case, without having any physical evidence on-scene of the accident that I could find, it was based – very highly based on the truthfulness of – or the interview of both drivers.

Trooper Kirby cited Mr. Lezama for careless driving causing bodily injury, failing to remain at the scene of an accident involving injury, and failing to notify police of an accident.

Ms. Anzora disclosed Trooper Kirby as a non-retained expert expected to testify consistently with the findings, opinions, and conclusions noted above. Defendants seek to exclude any of his opinions, drawings made, or citations given based on his assessment of the credibility of the parties. Credibility, they argue, is

the province of the jury. They further submit that, to the extent his opinions do not rely on the parties' statements, they were not based on sufficiently reliable accident analysis methods as to warrant inclusion. Ms. Anzora counters by suggesting that Trooper Kirby will not be offering impermissible opinion testimony because his conclusions were based on many factors other than the parties' credibility.

Defendants frame their motion under *United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014). There, the defendant was convicted of robbery after an FBI agent trained in "special tactics and ways to identify deception in statements and truths in statements" testified at trial that the defendant's "answers [during an interrogation] were not worthy of credence and did not make sense." *Id.* at 1251. The agent commented that certain of the defendant's statements were evasive and inconsistent with any he had heard from an innocent person. *Id.* He concluded, "My training has shown me, and more so my experience in all these interviews, . . . [that t]hose are deceptive statements." *Id.* On appeal, the Tenth Circuit agreed with the defendant that "the credibility of another person [ ] may not be addressed by an expert testifying under Rule 702" for several reasons:

> Such testimony: (1) "usurps a critical function of the jury"; (2) "is not helpful to the jury, which can make its own determination of credibility"; and (3) when provided by "impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury."

*Id.* at 1258 (quoting *United States v. Toledo*, 985 F.2d 1462 (10th Cir. 1993)). The Circuit explained that there are limited circumstances where expert testimony touching on the issue of credibility might be admissible, such as when jurors are

unlikely to understand psychiatric disorders which cause false confessions. *Id.* at 1262 (citing *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995); *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996)). But "there is a wide gulf between that type of specialized [ ] knowledge, which one would not expect a jury to possess, and testimony that merely asserts an opinion as to the veracity of an explanation that a jury is capable of resolving without expert testimony." *Id.* at 1262 (quoting *United States v. Adams*, 271 F.3d 1236, 1246 (10th Cir. 2001). Thus, to the extent an opinion is "'based on crediting [the witnesses'] account,' . . . it amount[s] to an expert 'essentially vouching for their truthfulness.'" *Id.* at 1259 (quoting *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999)).

Here, each party claimed that the other was to blame. As Trooper Kirby affirmed in his deposition, his conclusion that Mr. Lezama was at fault was "very highly based on the truthfulness . . . of both drivers." Despite this, Ms. Anzora submits that Trooper Kirby's opinions go beyond weighing credibility and were additionally based on the location of the roadway, time of the collision, vehicle damage, Ms. Anzora's decision to stop and report, and Mr. Lezama's admission to being distracted by the radio and his choice to keep driving. According to Ms. Anzora, these circumstances are not statements, and therefore Trooper Kirby could testify to their impact on him without inviting a credibility assessment.

The Court agrees that Trooper Kirby's testimony should not be excluded to the extent it relates to his investigation that does not turn on the parties' credibility. So, he may testify to the impression the location of the vehicles, who

called the accident in, the weather and road conditions, and where each party was found had on him. *See, e.g.*, *Martinez v. Salazar*, No. CV 14-534 KG/WPL, 2016 WL 9488862, at *3 (D.N.M. Dec. 14, 2016) (reviewing *Hill* and concluding that, to the extent the witness's conclusions did not rely on his credibility determination, those opinions could have been admitted). He will, of course, be permitted to give appropriate lay testimony about his involvement in this matter and the facts he observed.

His deposition and accident report, however, reveal that his interviews with the parties were integral to his opinion on ultimate liability. For example, the diagram in his accident report, which shows Mr. Lezama swerving entirely into Ms. Anzora's lane, could not exist absent his believing the latter and disbelieving the former. The Court notes the difficulty of following *Hill* in cases where, as here, an expert's opinion may be based only in part on a credibility assessment and is otherwise based on observations and knowledge of facts beyond the witness's honesty. Where conclusions are the result of blended credibility and non-credibility analysis, the danger of usurping the jury's essential function increases with a witness's reliance on the former. And here, based on Trooper Kirby's deposition testimony, that danger is high. Because his ultimate assessment that Mr. Lezama was at fault was so "very highly based on" his relative assessment of the parties' credibility, the Court holds that the opinion crosses into essentially testifying as to the witnesses' credibility. Trooper Kirby will not be permitted to vouch for the parties' truthfulness by explaining the effect their statements made upon him,

which led to his ultimate conclusion of who caused the accident, and how. His ultimate conclusions and the portions of his report that reflect them are excluded. Since his other proffered testimony, as described above, is not opinion testimony at all, but fact testimony, he may testify as a lay witness. But he may not testify as an expert witness under Rule 702.

### B. Defendants' Motion to Limit Testimony of Dr. Huntsman

Following unsuccessful chiropractic and injection therapy, Ms. Anzora sought additional treatment for neck pain, and her initial attorneys referred her to Intermountain Surgical Associates, LLC (IMS). IMS is a financing company that contracts with outpatient surgical centers and medical personnel to provide surgical care in advance of trial or settlement in exchange for a portion of a plaintiff's ultimate legal recovery. IMS connected Ms. Anzora to Dr. Kade Huntsman, M.D., ultimately paid for an operation on her neck, and currently has a lien on any judgment in her favor here.

On October 6, 2016, Ms. Anzora discussed the collision and her subsequent treatment with Dr. Huntsman. She told him that a mirror had crashed through her side window and that debris had struck her head and face. She reported neck pain and numbness that radiated through the left part of her body. Dr. Huntsman examined her and reviewed x-rays and a recent MRI. Based on her presentation, her symptoms, his physical examination, and the abnormalities reflected in the imaging, Dr. Huntsman recommended surgery, which he performed on November

30, 2016. IMS generated a $75,932.44 billing statement for the surgery performed.[1]
Dr. Huntsman then saw Ms. Anzora for post-operative visits on December 22, 2016, and on February 9 and April 20, 2017. He opined that she will require annual visits and likely a second operation within the next twenty years.

Ms. Anzora disclosed Dr. Huntsman as a retained expert. According to his report, Dr. Huntsman has been practicing spine surgery in Salt Lake County, Utah since 2002 and has performed thousands of operations. He owns an interest in a surgery practice as well as an out-patient surgical center in the area. He also testified that he has seen bills for the type of procedure he performed on Ms. Anzora that significantly exceeded the amount she was charged. In addition to offering certain medical opinions, Dr. Huntsman is set to testify that (1) "[i]t is [his] opinion beyond reasonable degree of medical probability that a total charge of $75,932.44 for Ms. Anzora's November 30 surgery . . . was well within the range of reasonableness for the price of a two-level ACDF procedure in Salt Lake County," and (2) "it is [his] opinion that the cost of the future surgery will be no less than the cost of the original surgery."

Defendants ask the Court to prevent Dr. Huntsman from testifying as an expert on the reasonableness of medical pricing for Ms. Anzora's past and future surgeries. First, they argue that such opinions are outside of his field of expertise.[2]

---

[1] The $75,932.44 is broken down as follows: $41,834.32 for facilities; $16,927.12 for supplies and equipment; $15,946.00 for Dr. Huntsman; $625.00 for anesthesia; and $600.00 for a physician's assistant.

[2] Defendants assert that "his experience with medical billing is limited to his 'general familiar[ity]' with 'the range of costs for ACDF procedures.'" (Doc. 95, at

Second, they believe his opinions are based on a subjective sense that prices are reasonable and not the product of a reliable methodology. Finally, they submit that his opinions are not based on reliable facts, such as a large pricing data set on which statistical analysis could be performed.

For her part, Ms. Anzora correctly states that she does not require expert testimony to support the reasonableness of her medical expenses. *Dedmon v. Cont'l Airlines, Inc.*, No. 13-CV-00005-WJM-NYW, 2016 WL 471199, at *7 (D. Colo. Feb. 8, 2016) ("[T]he Court agrees with Colorado courts that medical bills are 'some evidence' of reasonable value, even without supporting expert testimony."). Defendants' motion, however, is not concerned with whether what she is expected to pay is proper evidence of the reasonableness of those fees. Rather, Defendants only ask the Court to prevent *Dr. Hunstman* from opining on their reasonableness.

Though there may exist some individual more qualified than him to testify on these matters, Dr. Huntsman meets the strictures of Rule 702 and will be permitted to offer his opinion. His ownership of a surgery practice and surgical center has made him familiar with the range of costs associated with procedures he performed on Ms. Anzora, as well as the finances and revenue streams of the related business aspect. Based on that experience and his personal observation of pricing in the field, he should be able to assist the jury in placing Ms. Anzora's bill within the range of

---

7 (quoting Huntsman Dep., Doc. 95-4, at 39:5–7).) This misrepresents the testimony, which contains no such limitation: "Q. Are you generally familiar with the range of costs for ACDF procedures? A Yes. Sure." (Huntsman Dep., Doc. 95-4, at 39:5–7.)

related services in the Salt Lake County area. Defendants accuse this opinion of being too anecdotal, arguing that the appropriate testimony in this case would be by an "expert in medical pricing" who "gather[ed]" a large set of relevant data and perform[ed] statistical analysis on the same." Perhaps presciently, this court in *Dedmon* already noted the trouble with data-gathering to ascertain reasonable medical costs:

> It is probably a matter of common opinion that pricing for medical goods and services in this country is entirely mysterious. Indeed, the very notion that there exists a "reasonable value" for this sort of thing seems dubious. "Reasonable value" implies some sort of fair market value, yet there are very few areas in the medical field where providers appeal to potential patients through price competition.

*Id.* at *7. Whether or not attempting to discern fair market value of certain medical procedures is a fool's errand, the law does not say that only analysts or economists are pre-qualified to offer the types of opinions at issue here. In fact, it explicitly permits an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Defendant's concerns go to the weight that should be given to Dr. Huntsman's opinion on the bills, not its admissibility. Should Defendants wish to erode Dr. Huntsman's opinions with proper cross-examination, they may do so. But at this juncture, they have not shown that he should be outright disqualified from testifying to these matters.

## C. Defendants' Motion to Exclude Testimony of David Gillies

As noted above, IMS is the finance company that funded Ms. Anzora's surgery. In determining the amount to charge a patient, IMS generates a list of Current Procedural Terminology (CPT) codes[3] involved in the applicable procedure. It forwards the codes to its outside vendor ConsulMed LLC, a medical billing and consulting firm that evaluates services based on those codes and generates facility charges for the procedures that have been done.[4] According to its principal Gavid Gillies, to determine facility charges ConsulMed accesses two databases, one of which is compiled by ConsulMed itself and the other is compiled by a company called Fair Health. Using those data sets, ConsulMed generates a master charge list by CPT code. Mr. Gillies testified that, with respect to Ms. Anzora, ConsulMed received the CPT code information from IMS, reviewed the ConsulMed and Fair Health data, determined the facility fee of $41,834.32 was the mode of the total population of available data, and concluded that the charge fell in approximately the 50th percentile, which it asserts is "customary in the industry." Ms. Anzora disclosed Mr. Gillies as a lay witness to testify concerning his ownership of ConsulMed, the company's involvement in setting the facility charges in this case, the processes and data used in setting those charges, and that those charges reflect a "usual and customary amount" for the services she received. Defendants seek to

---

[3]  This standard code set is published and maintained by the American Medical Association.

[4]  *See* Doc. 95-1 (IMS statement to Ms. Anzora incorporating facility charges calculated by ConsulMed).

14

exclude Mr. Gillies as an improperly disclosed expert masquerading in lay witness clothing.

Federal Rule of Evidence 701 governs admissibility of lay opinions:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Rule 701 was amended in 2000 to curtail parties' attempts to evade the reliability and disclosure requirements applicable to experts. Fed. R. Evid. 701 advisory committee's note to 2000 amendment. "Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.* (incorporating *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190 (3d Cir. 1995)). But the amendment is not intended to affect the "prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." *Id.* (quoting *Asplundh Mfg. Div.*, 57 F.3d at 1196; language adopted in *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011)). Thus, Rule 701 opinion testimony

results from a process of reasoning familiar in everyday life or knowledge that the witness has by virtue of his or her position within a particular field, while Rule 702 opinion testimony "results from a process of reasoning which can be mastered only by specialists in the field." *Id.* Importantly, "[t]he amendment does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*." *Id.* (emphasis in original; citing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)).

Three Tenth Circuit cases illustrate the difference between Rule 701 lay opinion testimony and Rule 702 expert testimony in the context of mathematical analysis. In *Bryant v. Farmers Insurance Exchange*, the Circuit held that a witness should have been permitted to testify under Rule 701 to elementary operations:

> Taking a simple average of 103 numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy. A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701.

432 F.3d 1114, 1124 (10th Cir. 2005). In *LifeWise Master Funding v. Telebank*, the Circuit found inadmissible under Rule 701 a CEO's testimony about his business's lost profits because his results were based on more sophisticated economic models:

> [A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person. . . . The [lost profits] model concerned moving averages, compounded growth rates, and S-curves: [The witness] could not testify about these technical, specialized subjects under Rule 701.

374 F.3d 917, 929 (10th Cir. 2004). Relying on those cases, in *James River Ins. Co. v. Rapid Funding, LLC*, the Circuit decided that testimony from a business's principle concerning a valuation of lost property, including calculating depreciation and choosing among different types of depreciation, more closely resembled that in *LifeWise* than in *Bryant* and was not properly admitted under Rule 701:

> Unlike taking an average, calculating depreciation requires more than applying basic mathematics. Technical judgment is required in choosing among different types of depreciation. . . . He also needed to account for the deterioration and neglect that caused the North Building to be condemned. Accurately accounting for the interaction between depreciation and damage requires professional experience and is beyond the scope of lay opinion testimony.

658 F.3d at 1214.

Here, much of Mr. Gillies's testimony is not opinion under either Rules 701 or 702. His position within ConsulMed, the work that company does, its process for generating facility fees, and the actions it took with respect to Ms. Anzora's bill all flow from personal knowledge and require no belief or inference about a disputed fact. And the formulas he employed to arrive at Ms. Anzora's facility charges are technically not opinions at all—they are the mathematical explanation of the bill— and the jury will be permitted to hear how her bill came to be.

But Mr. Gillies's conclusion that the amount billed to Ms. Anzora is "reasonable" or "usual and customary" in the industry cannot be admitted under Rule 701. That conclusion requires specialized knowledge of that industry, together with an inference that only one with a mastery of that industry would be qualified

to make. Not only would Mr. Gillies's have to plug in codes and pick a number from the center, but he would have to be familiar enough with the industry to understand whether the lists themselves were trustworthy, which in turn would require intimate and specialized knowledge of the surgical trade at issue. To the extent it is his opinion that ConsulMed's process arrive at a result that is "reasonable" or "usual and customary," it is one that requires specialized knowledge of the sort held outside Rule 701 in *James River* and *LifeWise*.

It is possible Mr. Gillies might have been qualified as an expert to offer that testimony, as Dr. Huntsman has been, but he was not properly disclosed under Rule 702, so he cannot testify as an expert. The Court will permit Mr. Gillies to testify at trial as to how ConsulMed arrived at the facility charges billed to Ms. Anzora, but he may not offer an opinion or otherwise testify that they were reasonable or usual and customary in the industry.

### D. Defendants' Motion to Disqualify Counsel or Bar Testimony by IMS

Ms. Anzora's current counsel also represents IMS,[5] which financed her surgery and has a contractual right to recoup the value of the medical expenses it advanced (presumably plus some interest or fee). At trial, Ms. Anzora expects IMS to testify through Mr. Gillies in the manner discussed above. Defendants argue

---

[5] It appears that a different attorney at Plaintiff's counsel's law firm Christensen & Jensen, P.C. also represents IMS.

these circumstances implicate Colorado Rules of Professional Conduct 1.7 and 3.4. The Court disagrees.

"Generally, courts do not consider claimed violations of ethics rules raised by nonclients. However, 'where the Rules of Professional Conduct become intertwined with litigation and a potential ethical violation threatens to prejudice the fairness of the proceedings, a court may consider an ethical violation within the context of the litigation.'" *Liebnow by & through Liebnow v. Bos. Enterprises Inc.*, 296 P.3d 108, 113 (Colo. 2013) (quoting *Mercantile Adjustment Bureau, L.L.C. v. Flood*, 278 P.3d 348 (Colo. 2012)). The "critical question is whether the litigation can be conducted in fairness to all parties," and courts must balance its protection of the integrity of the trial against a party's interest in continued representation by the counsel of their choice. *Id.* at 113–14.

First, Defendants believe Ms. Anzora's counsel's representation of both her and IMS represents an improper concurrent conflict of interest. "A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." Colo. RPC 1.7. According to Defendants, if Ms. Anzora does not recover a certain amount at the upcoming trial, IMS will either have to proceed with collection efforts against her or write off its claims. This, they submit, calls into question the integrity of this proceeding.

But in this case, the interests of IMS and Ms. Anzora are aligned, not adverse: Both hope the latter prevails in this lawsuit. A series of hypothetical events would have to occur for them to be impermissibly at odds. Ms. Anzora would have to lose here or fail to pay, IMS would have to insist on collecting, and both would have to remain with the same counsel for there to be any then-concurrent conflict. And should each of these transpire, it will not be of any concern to Defendants and certainly would not implicate Ms. Anzora's counsel's performance during this trial. It is always the case that currently aligned parties could become adverse should litigation turn out poorly. But until that becomes a reality, or at least "a significant risk," it does not give the Court any reason to question whether this matter can be conducted in fairness to all parties.

Defendants' second theory is that Ms. Anzora's counsel will suborn improperly favorable testimony because IMS's possible recovery of its surgery advance is analogous to paying a witness an improper contingent fee in exchange for its testimony. "A lawyer shall not . . . falsify evidence, counsel or assist a witness to testify falsely, or offer and inducement to a witness that is prohibited by law." Colo. RPC 3.4(b); *see also id.* at Comment 3 ("It is improper to pay any witness a contingent fee for testifying."). In *Murray v. Just In Case Business Lighthouse, LLC*, to which Defendants cite, the Colorado Supreme Court recognized that "RPC 3.4(b) unambiguously prohibits paying witnesses contingent fees," but held that "the violation of an ethical rule does not displace the rules of evidence and that trial courts retain the discretion under CRE 403 to exclude the testimony of improperly

compensated witnesses." 374 P.3d 443, 450 (Colo. 2016), *as modified on denial of reh'g* (July 18, 2016); *see also, e.g., Tagatz v. Marquette Univ.,* 861 F.2d 1040, 1042 (7th Cir. 1988) ("It is unethical for a lawyer to employ an expert witness on a contingent-fee basis, [but] it does not follow that evidence obtained in violation of the rule is inadmissible.") (citation omitted); *Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Corp.*, 546 F.2d 530, 539 (3d Cir. 1976) (although rules of professional responsibility "inveighs against" attorney testifying as expert witness for client of his law firm, "it does not necessarily follow that any alleged professional misconduct on his part would in itself render his testimony, once it was adduced, a nullity."); *In re Joy Recovery Tech. Corp.,* 286 B.R. 54, 69 (N.D. Ill. Bankr. 2002) (holding that the Federal Rules of Evidence do not bar testimony from contingent fee experts); *World Youth Day, Inc. v. Famous Artists Merch. Exch., Inc.*, 866 F. Supp. 1297, 1303 (D. Colo. 1994) (noting that the trial court's focus should be on fairness, even if testimony by a witness would violate a rule of professional conduct).

Even were those state authorities applicable here, as a technical matter the financial investment at issue does not appear to be a contingent fee.[6] By contrast to a contingent fee arrangement, where a party is paid only after achieving a favorable outcome, it seems IMS retains a right to repayment even if Ms. Anzora loses. IMS will have a potential financial interest in the outcome of the case whether it testifies

---

[6] No party has filed a copy of the lien in question, rendering it impossible for the Court to know whether IMS's right to payment is absolute or contingent upon victory.

or not. In other words, IMS is not being paid to testify, as was the case in *Murray*, for example. Its fee is due for services already rendered to Ms. Anzora, not its testimony.

That it may not obtain full payment unless Ms. Anzora is successful does not alter the conclusion. Witnesses often have a financial interest in the outcome of a case—notably the parties themselves in this and nearly every other case, family members, business associates, and so on. That circumstance, standing alone, is not reason enough to exclude a witness or to reconstrue its interest as a contingency fee. Even if Ms. Anzora's counsel would violate the Rules of Professional Conduct by calling IMS at trial, that is a matter for state authorities. Here, the question is limited to whether this undermines the fundamental fairness of the proceeding. While the Court shares some of the Defendants' concerns with arrangements such as those here that intermingle the financial interests of medical providers, finance companies, attorneys, and plaintiffs, there is no indication that permitting current counsel to proceed does so. The Defendants can use this arrangement to call into question this witness's testimony, but excluding it would not be an appropriate sanction under the circumstances.

### E. Ms. Anzora's Motion to Exclude Dr. Panchangam, Ph.D.

Defendants retained Dr. Panchangam, biomedical engineer, to reconstruct the collision and evaluate the consistency of Ms. Anzora's claimed injuries with the motions and forces involved in it. Dr. Penchangam reviewed the accident report, photos of Ms. Anzora's truck, photos of the collision location, repair estimates for

Ms. Anzora's truck, an independent report on Ms. Anzora's medical records, Dr. Huntsman's report, depositions of the parties and Trooper Kirby, the pleadings in this case, and various reference materials and studies. He concluded that (1) the side mirrors of the two semi tractor-trailer units contacted in opposing directions with minimal overlap, there was no other vehicular contact, and the trucks' motion would not have been affected by this contact; (2) because there would be no accident-induced motion on the trucks, there would be no accident-induced motion on the occupants; (3) Ms. Anzora's cuts would be consistent with broken glass pieces intruding into the occupant space and making contact with her body; (4) no motion-induced injuries to either driver or passenger would be expected from the collision; (5) the mechanisms that cause disc herniations and osteophytes in the cervical spine were not at play in the collision, and no exacerbation of pre-existing disc pathology would be expected for the occupants of Ms. Anzora's truck. Ms. Anzora does not contest Dr. Panchangam's general knowledge, skill, experience, training, or education qualifications, but objects to his testimony for a variety of reasons.

The Court will first address whether, as Ms. Anzora argues, Dr. Panchangam's testimony is unfairly prejudicial. According to Defendants, his opinion regards forces caused by the impact of two driver-side mirrors and the effect of those forces on the occupants of Ms. Anzora's cab. This, they argue, means that the forces at play were too small for Ms. Anzora's neck injuries (which she had surgery to address) to be caused by the collision. In response, Ms. Anzora contends that the injuries she suffered were not due to the force of the vehicles' contact, but

instead caused by her sudden, reflexive, and rapid movement of her body and neck away from perceived danger and incoming debris. She therefore sees Dr. Panchangam's opinion as a straw man designed to mislead a jury away from her more specific cause of injury and believes he should be excluded under Rule 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."). The Court finds Dr. Panchangam's conclusions, which directly analyze the possibility that the injuries claimed by Ms. Anzora could have been directly caused by the forces resulting from the collision—of significant probative value to this case. Defendants are not required to take a plaintiff's theory of injury on her terms, and they are permitted to present evidence tending to rule out certain potential causes, especially ones integral to the events at issue. There is also not much danger of unfair prejudice. "The 'unfair prejudice' stated in Rule 403 cannot be equated with testimony which is simply unfavorable to a party. It must be unfair in the sense that it would be misleading and not aid and assist the jury in making a material determination in the case." *McEwen v. City of Norman, Okl.*, 926 F.2d 1539, 1549–50 (10th Cir. 1991). Dr. Panchangam's testimony is prejudicial only to the extent it is unfavorable. But his view is not unfair merely because it differs from Ms. Anzora's, and the jury will be able assess the value it should be assigned. Whatever minimal risk there may be of improper influence does not outweigh the significant probative value and so this is not a case that triggers the

"extraordinary remedy" supplied by Rule 403. *United States v. Smalls*, 605 F.3d 765, 787 (10th Cir. 2010).

Turning to Rule 702, Ms. Anzora argues that Dr. Panchangam did not employ any reliable methodology and did not base his opinions on sufficient facts or data. She points to *Bullock v. Daimler Trucks N. Am., LLC*, another trucking case, where this court excluded an opinion that the plaintiff was most likely pulled or ejected through the passenger side door at the time of the crash. No. 08-CV-00491-PAB-MEH, 2010 WL 4115372, at *4 (D. Colo. Sept. 30, 2010). There, the basis for the expert's opinion was the testimony of individuals at the scene, but none of them knew how the plaintiff had exited the truck, and the expert had not explained how he got from a lack of evidence to a definitive opinion about the plaintiff's exit path. *Id.* In *Squires v. Goodwin*, to which Ms. Anzora also cites, the court took issue with a proffered opinion that certain ski devices had a defective design simply because the ones at issue had broken during a single impact. 829 F. Supp. 2d 1041, 1051 (D. Colo. 2011). The court was not impressed with the expert's blanket allusion—without any further explanation or technical analysis—to "some sort of [alternative] braking device" the defendants should have included on the ski. *Id.* at 1052. The court concluded that the expert's report was "devoid of any analysis or methodology that would link the pertinent materials reviewed to the opinions and conclusions directed toward" the defendant. *Id.* at 1051. Essentially, in both cases, the district court excluded certain conclusions where the offering expert glossed over an

"analytical gap" to reach a conclusion without "show[ing] his work." *Bullock*, 2010 WL 4115372, at *4; *Squires*, 829 F. Supp. 2d at 1052.

Appealing to these cases, Ms. Anzora accuses Dr. Penchangam of employing no methodology at all. She first attacks his failure to "calculate the force in the [C]ollision or do any other testing to derive the force created." While Dr. Penchangam could have been more detailed, the Court sees no defect in his approach and no obvious gaps in his reasoning. Unlike the analytical chasms leapt over by the experts in *Bullock* and *Squires*, the Court understands the methodology Dr. Penchangam employed. In fact, in *Bullock*, the court permitted one opinion that the crash was "particularly aggressive due to the energy involved," stating "[w]hile the report lacks extensive details on the calculations involved, the opinion is not the kind of opinion that requires such detail. The Supreme Court has endorsed a district court's discretion in making the level of scrutiny commensurate with the intricacy of the proposed opinion." *Bullock*, 2010 WL 4115372, at *6 (citing *Kumho Tire Co.*, 526 U.S. at 152). Here, in like (but opposite) fashion, given the relative *lack* of damage involved in the collision, the Court finds Dr. Panchangam's more generalized methodology valid and reliable in the same way that the court did in *Bullock* when confronted with the severe forces at play there. His conclusions that the truck's motion would not have been affected by the contact and no accident-induced motion would have occurred for the occupants of Ms. Anzora's truck are reliable enough to warrant inclusion. Ms. Anzora's arguments about the completeness of Dr. Penchangam's data or potentially overlooked considerations do

not, in this instance, undermine the reliability of the methodology. They instead relate to the weight which his opinions deserve.

Ms. Anzora also takes issue with Dr. Panchangam's opinion, upon his review of the medical literature and the neck deformities for which she was treated, that the abnormalities in her neck she underwent surgery to address were consistent with pre-existing degeneration. He may not be ultimately correct—and indeed, Ms. Anzora has her own expert who concluded otherwise—but this controversy amounts to a difference of opinion between competing experts, not a basis to exclude him or permit his testimony in this regard.

Finally, Ms. Anzora asserts that Dr. Penchangam failed to account for (and could not ever exactly know) the direction and extent of her reflexive bodily movement during the collision. She therefore finds unreliable his opinion that she likely moved to the right and rearward, that this volitional motion would not be excessively outside the normal physiological range, and therefore it did not cause her neck injuries. Here, the Court agrees. Dr. Penchangam's opinions concerning whether injury can be caused by volitional, reactionary movement read as reliable, but his assumptions about Ms. Anzora's actual movement during the collision are admittedly speculative. He does not know how high up Ms. Anzora's seat was, how tall she is, or what parts of the mirror initially contacted the window but was comfortable assuming the general direction of what he calls the "source of danger." His notion, which recognizes his lack of information about how Ms. Anzora actually moved, and that a driver in her shoes would likely move rearward rather than

forward, is based only on his own "common sense,"[7] a source unhelpful to a jury's assessment because it does not flow from specialized knowledge, skill, experience, training, or education. In fact, Dr. Panchangam could not rule out moving forward as one way for Ms. Anzora to have moved away from the source of danger. These opinions impermissibly draw conclusions from a lack of information, and Dr. Panchangam will not be permitted offer opinions on what injuries her voluntary bodily motions may or may not have caused.

## III.    CONCLUSION

For the foregoing reasons,

1.  The motion to limit testimony of Trooper Kirby (Doc. 87) is **GRANTED IN PART**;

2.  The motion to limit testimony of Dr. Huntsman (Doc. 95) is **DENIED**;

3.  The motion to exclude testimony of Mr. Gillies (Doc. 97) is **GRANTED IN PART**;

4.  The motion to disqualify counsel and exclude evidence by IMS (Doc. 96) is **DENIED**;

5.  The motion to exclude testimony of Dr. Penchangam (Doc. 110) is **GRANTED IN PART**.

Dated: July 24, 2019

                                    **BY THE COURT:**


                                    */s/Daniel D. Domenico*
                                    Hon. Daniel D. Domenico
                                    United States District Judge

---

[7]   *See* Dr. Panchangam Dep., Doc. 110-4, at 87:12–20.